[Cite as *State ex rel. Lowe v. Ohio Pub. Emps. Retirement Sys.*, 2014-Ohio-4773.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio ex rel. Uneek V. Lowe, :

        Relator, : No. 13AP-627

v. : (REGULAR CALENDAR)

[Ohio Public Employees Retirement : 
System], 
         :
        Respondent. 
         :

_____

D E C I S I O N

Rendered on October 28, 2014

_____

*Uneek V. Lowe,* pro se.

*Michael DeWine*, Attorney General, and *Matthew T. Green,* for respondent.

_____

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

TYACK, J.

{¶ 1} Relator, Uneek V. Lowe, brought this original action requesting a writ of mandamus ordering respondent, Ohio Public Employees Retirement System ("OPERS"), to vacate its decision terminating her disability benefits and to enter a decision reinstating disability benefits.

**I. Procedural History**

{¶ 2} Under Civ.R. 53 and Section (M), Loc.R. 13 of the Tenth Appellate District, this matter was referred to a magistrate who issued a decision that is appended to this decision. The magistrate determined: (1) the OPERS Board of Trustees ("board") was not required to determine whether the alleged disabling medical conditions prevent

relator from performing her recent position at Fifth Third Bank; (2) none of the medical reports need be eliminated from evidentiary consideration due to an alleged failure of the examining physician to show sufficient knowledge of relator's job duties at the Hamilton County Department of Job and Family Services ("HCDJFS"); and (3) there is some evidence in the record supporting the board's presumed determination based upon pertinent R.C. 145.362 examinations, that relator is no longer physically and psychologically unable to perform her former position at HCDJFS upon which her disability benefit was premised. Accordingly, the magistrate determined the requested writ should be denied.

## II. Objections

{¶ 3} Relator filed objections to the magistrate's decision. These were not separately numbered, but rather contained in a somewhat free flowing 21-page document. From our review of this document, relator raises the following issues:

> 1. Respondent abused its discretion by using the wrong job description for relator's private part-time job with Fifth Third Bank.
>
> 2. Respondent did not take into account relator's public job duties with HCDJFS when it terminated her disability benefits.
>
> 3. Respondent failed to consider relator's Attention Deficit Hyperactivity Disorder ("ADHD"), her Arnold Chiari Malformation, and her need for accommodations when it terminated her disability benefits.
>
> 4. The magistrate erred in finding there was some evidence that relator is no longer physically and psychologically unable to perform her former position at HCDJFS.

## III. Private Sector Job Description

{¶ 4} While receiving disability benefits from OPERS and the Social Security Administration, relator took a part-time position with Fifth Third Bank embossing credit cards. (Magistrate's decision, 6.) Some time after she took the job, relator submitted a form for an employment review to determine whether the part-time job would result in the termination of benefits. OPERS' third-party administrator, Managed Medical Review

Organization ("MMro"), conducted an assessment of the job duties of relator's last public position as a Program Technician 2 for HCDJFS and her part-time position for Fifth Third Bank.  The MMro's assessment overlapped relator's annual medical review.

{¶ 5}   The MMro found similarities between the work activities in each job. Relator has identified mistakes in the MMro's assessment of her work with the private sector employer.  For example, the assessment states: "Helps w/tutoring of the students. * * * Organizes all group meetings, activities and special trips."  (R. 276.)  Relator is correct that this part of the MMro's assessment describing the part-time position at Fifth Third Bank is in error.

{¶ 6}   Nevertheless, the argument is without merit.  The part-time job description is not relevant to the core issue in this case which is "whether the disability benefit recipient is no longer physically and mentally incapable of resuming the service from which the recipient was found disabled."  *See* R.C. 145.362. The part-time job description is not related to relator's annual medical review for a disability determination.  The medical doctors were asked to base their review on her public employment job description.  Neither the medical doctors nor the board relied on the reemployment assessment when deciding whether relator was permanently disabled.  Therefore, even if there were errors in the MMro's assessment, any such error is harmless as it does not relate to the issue of whether relator is capable of resuming her public service.

## IV.  Public Job Description

{¶ 7}   With respect to her public sector job with HCDJFS, relator contends that OPERS failed to take into account her public job duties when it terminated her disability benefits.

{¶ 8}   Our independent review shows that the record is replete with references to relator's public sector job.  The job description is set forth in full in the magistrate's decision.  The doctors who conducted relator's medical assessments stated they were familiar with her responsibilities at HCDJFS, reviewed her job description, and in several instances, recounted in detail relator's history at HCDJFS.  The MMro's assessment also sets forth a correct description of relator's duties at HCDJFS.

{¶ 9}   There is no merit to this objection.

## V. ADHD, Arnold Chiari Malformation, and the need for accommodations

{¶ 10} Relator argues there was no evidence that her Attention Deficit Disorder was viewed or considered as part of the decision to terminate her disability benefits. Again, the record belies this assertion. The following quotes are a sample of the documentation of relator's diagnosis of ADD or ADHD. Robert Krikorian, PhD, conducted a neuropsychological evaluation of relator in 2011 and wrote further in 2012 commenting on the findings of the neuropsychological evaluation. He stated: "Our evaluation indicated that you have deficits of attention and executive ability, among others." (R. 475.) He also stated, "you described in particular being overwhelmed and ineffective when working as a technician for Hamilton County Job and Family Services. You cited the volume of work as a major difficulty in that position. Your experiences with that job would be consistent with the findings on our evaluation of attention and executive impairment." (R. 475.) He also states: "Ms. Lowe grew up with developmental cognitive disorder affecting attention and executive ability, which can be characterized as Attention Deficit Disorder." (R. 471.)

{¶ 11} In January 2012, Leroy Vickers, M.D., wrote: "Ms. Lowe has chronic fibromyalgia, ADHD, some memory loss and at this time Ms. Lowe indicates, and I agree with her that she is permanently disabled but could return to work with Hamilton County with accommodations." (R. 468.)

{¶ 12} In relator's examination by Michael Miller, M.D., he noted that "ADHD treatment is quite successful when it comes to the Adderall." (R. 411.) D. Ann Middaugh, M.D., M.S., noted that Adderall helped relator to concentrate, but that she stopped taking it until she started the job with Fifth Third Bank. (R. 418.) Thus, it appears that while relator had been diagnosed with ADHD, she was able to function successfully when she used the medication Adderall.

{¶ 13} Contrary to relator's assertion, ADD and/or ADHD were viewed and considered as part of the decision to terminate benefits. This argument is without merit.

{¶ 14} Relator also argues that her Arnold Chiari Malformation was not considered in the decision to terminate her disability benefits. Again, numerous references to the medical evidence in the record noted D. Ann Middaugh, M.D., M.S., wrote, "[s]he has an asymptomatic Chiari-I malformation discovered by MRI scan. This is a congenital condition in which the cerebellar tonsils descend into the upper cervical canal

anatomically. She has no physical correlation for these findings." (R. 421.) Other reports indicated "very mild symptomology," (R. 331.) "minimally, if at all, symptomatic," (R. 340.) and that her malformation was "thought to be minimally symptomatic by previous neurological evaluation." (R. 357.)

{¶ 15} Relator contends that she is unable to resume her prior public service because HCDJFS refused her request for reasonable accommodations.

{¶ 16} Relator has conflated her claim against HCDJFS for disability discrimination under the Americans with Disabilities Act ("ADA") with her claim that she is unable to resume her public service. The ADA defines "disability" as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. 12102(2). The standard used by the board in this case is "whether the disability benefit recipient is no longer physically and mentally incapable of resuming the service from which the recipient was found disabled." *See* R.C. 145.362.

{¶ 17} The standard used to determine whether relator is entitled to a writ of mandamus is whether there is some evidence to support the board's decision.

{¶ 18} Relator's claim that she is disabled because she was denied reasonable accommodations is not well-taken.

## VI. Some Evidence

{¶ 19} In order to obtain a writ compelling the board to vacate its decision to terminate her disability benefits, relator must show that the board abused its discretion by entering an order that is not supported by some evidence. *State ex rel. Marchiano v. School Emps. Retirement Sys.*, 121 Ohio St.3d 139, 2009-Ohio-307, ¶ 20-21; *Kinsey v. Bd. of Trustees of Police and Firemen's Disability and Pension Fund of Ohio*, 49 Ohio St.3d 224, 225 (1990); *State ex rel. Schaengold v. Pub. Emps. Retirement Sys.*, 114 Ohio St.3d 147, 2007-Ohio-3760, ¶ 19.

{¶ 20} Six different medical doctors determined that relator is not disabled from her most recent public position with HCDJFS: Michael Miller, M.D.; D. Ann Middaugh, M.D.; Andrew Smith, M.D.; Mark Reynolds, M.D.; Jeffrey Deitch, D.O.; and Maurice Mast, M.D. That is some evidence to support the board's decision to terminate relator's disability benefits.

## VII.  Conclusion

{¶ 21} Based on our independent review under Civ.R. 53, we find the magistrate properly determined the relevant facts and applied the salient law to them.  Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it.  Therefore, we overrule relator's objections and deny the requested writ of mandamus.

*Objections overruled; writ denied.*

SADLER, P.J., and CONNOR, J., concur.

————————————————

# A P P E N D I X

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

State of Ohio ex rel.                                    :
Uneek V. Lowe,

                                                         :

            Relator,

                                                         :

v.

                                                         :              No.  13AP-627
[Ohio Public Employees Retirement
 System],                                                :              (REGULAR CALENDAR)

            Respondent.                                  :

---

## M A G I S T R A T E ' S   D E C I S I O N

### Rendered on July 15, 2014

---

*Uneek V. Lowe*, pro se.

*Michael DeWine*, Attorney General, and *Matthew T. Green*, for respondent.

---

### IN MANDAMUS

{¶ 22}  In this original action, relator, Uneek V. Lowe, requests a writ of mandamus ordering respondent, Ohio Public Employees Retirement System ("OPERS"), to vacate its June 20, 2012 decision terminating disability benefits, and to enter a decision reinstating disability benefits.  That is, relator requests that the writ order the Ohio Public Employees

Retirement Board ("board") to vacate its June 20, 2012 decision and to enter a decision reinstating disability benefits.

Findings of Fact:

{¶ 23} 1. In May 2006, relator filed a disability benefit application on a form provided by OPERS. Relator had been employed by the Hamilton County Department of Job and Family Services ("HCDJFS"). Her position title was "CPA Specialist." Her classification title was "Program Technician 2."

{¶ 24} 2. In May 2006, HCDJFS completed a form provided by OPERS captioned "Report of Employer for Disability Applicant." HCDJFS also provided a "position description" indicating that relator's job required her to perform the following tasks:

> 60% [One] Determines eligibility for Healthy Start, Healthy Families and the Expedited Medicaid Programs. Conducts applications processing and gathers necessary information to make determination of program eligibility. Obtains necessary verifications required for program eligibility, follow-up with consumers by phone to clarify and verify eligibility. Completes face-to-face interviews with walk-in consumers. Inputs all documentation into computer system.
>
> 20% [Two] Issues correspondence and completes follow-up. Maintains necessary records and data; responds to requests for information and all phone calls, e-mails, and faxes in a timely manner.
>
> 10% [Three] Maintains awareness of all assistance programs and services offered by the agency. Enrolls and refers consumers for HMO enrollment process. Processes and completes special reports when necessary.
>
> 5% [Four] Completes statistical reports of program/work activity.
>
> **OTHER DUTIES AND RESPONSIBILITIES:**
>
> 3% [Five] Attends meetings, training and community presentations as required.
>
> 2% [Six] Performs other related duties as assigned.
>
> **POSITIONS SUPERVISED:**

None

{¶ 25} 3. On May 10, 2006, attending physician and psychiatrist Jonathan Bernfeld, M.D., completed a "Report of Attending Physician for Disability Applicant" on a form provided by OPERS.

{¶ 26} Section three of the form requests that the attending physician report his findings.

{¶ 27} For his diagnoses, Dr. Bernfeld wrote:  "Chronic Major Depression" and "Chronic Pain."

{¶ 28} For the symptoms, Dr. Bernfeld wrote:  "[I]rritability, pain, low energy, poor concentration, anxiety."

{¶ 29} For the prognosis, Dr. Bernfeld wrote:  "Arnold Chiari malformation [plus] syrinx causing chronic pain.  Also fibromyalgia."

{¶ 30} On the form, Dr. Bernfeld indicated by his mark that relator "is * * * considered to be permanently disabled."

{¶ 31} 4. On July 17, 2006, at the request of OPERS, relator was examined by psychiatrist William Beatty, M.D.  In his three-page narrative report, Dr. Beatty states:

{¶ 32} Ms. Lowe states that she has essentially four conditions:

> [One] Attention Deficit Disorder with Hyperactivity
> [Two] Arnold-Chiari malformation
> [Three] Chronic Fatigue Syndrome
> [Four] Fibromyalgia.
>
> It is difficult to discern the exact boundaries of these diagnoses in describing her symptoms. She does experience chronic fatigue and does have generalized musculoskeletal pains nearly continuously. She also claims to have ADD and to be in need of accommodation for this in regard to work load.
>
> * * *
>
> For some reason Ms. Lowe has some dysphoric moods and apparently has had some major depressive episodes in her life leading to hospitalizations. This coupled with her volatility may suggest a "soft" Bipolar Disorder of a chronic

nature. This is a relatively minor factor in her disability compared to the Arnold-Chiari malformation with its possibly causing or contributing phenomena of fatigue and chronic pain. ADD is a further issue. She has multiple stressors in her life including her son's behavioral problems, her finances, her single status and the possibility of litigation. She also states that she has lost her insurance including her life insurance and her car has been repossessed. She rarely has a good day but does occasionally enjoy her hobbies of sewing and making purses. She feels that her fatigue is the most debilitating of her problems and this is what really prevents her from returning to work. * * *

It appears to me that Ms. Lowe has a legitimate, severe neurologic problem the surgical treatment for which is far from satisfactory. The exact relationship of this condition to her other illnesses is somewhat unclear to me but perhaps a neurologist or neurosurgeon could clarify this. Dr. Bernfeld implied that several of her symptoms were due to the Arnold-Chiari malformation. I would be inclined to accept this and consider that Ms. Uneek Lowe is permanently disabled mentally and physically for the performance of duty and should be entitled to an OPERS Disability benefit. It may be that OPERS would elect to seek statements from either Ms. Lowe's neurologist or neurosurgeon as to whether her Arnold-Chiari malformation is thought to be producing the fatigue and chronic pain. This also may be determined to be unnecessary.

{¶ 33} 5. On August 18, 2006, at the request of OPERS, relator was examined by Marvin H. Rorick, M.D., who specializes in neurology. In his three-page narrative report, Dr. Rorick stated:

**Disability claimed by reason of:**

Inability to continue her type of work responsibility as she has done previously in the welfare office. The patient is a Medicaid eligibility technician. She stopped doing this type of work in 2004. * * *

**Diagnosis:**
[One] Chiari Malformation Type I with cervical syrinx.
[Two] Chronic tension headache.
[Three] Major depression.
[Four] Attention deficit hyperactivity syndrome.

* * *

**Past History:**
Notable for Attention deficit hyperactivity syndrome.
The patient has apparently not received direct treatment for this disorder but has been treated with antidepressant medication in the past. She reports two hospitalizations for depression, the most recent of which occurred in the late 1990's.

She also reports that she had a Bell's palsy in 1999 with almost total recurrent function to the right side of the face.

* * *

From the stand point of the patient's Arnold chiari malformation type I and cervical syrinx, the patient has very mild symptomatology and has been advised not to have occipital decompressive surgery. The patient does have chronic headaches which maybe [sic] due to other causes. In addition, she has a significant underlying depression which is certainly worsened by her chronic daily pain. Unfortunately, it is impossible to predict the patient's reliability in a work place.

She has already been disabled for greater than two years and appears unlikely to be able to resume that type of work activity that she previously performed.

For the above reasons, the patient is presumed to be permanently disabled for the performance of duty and should be entitled to a disability benefit.

{¶ 34} 6. By letter dated September 20, 2006, OPERS informed relator that the board had approved her disability application retroactive to February 1, 2005.

{¶ 35} 7. In February 2008, May 2009, and October 2010, the board approved the continuation of benefits. Each time, relator was informed that continued receipt of benefits was conditioned upon her seeking psychiatric treatment.

{¶ 36} 8. By letters dated October 3, 2011, OPERS informed relator that she was scheduled for two medical examinations—one by psychiatrist Michael E. Miller, M.D., and

the other by Deborah Ann Middaugh, M.D., who specializes in internal medicine and occupation and environmental medicine.

{¶ 37} 9. On October 17, 2011, relator was examined by Dr. Miller. In his eight-page narrative report, Dr. Miller states:

> EMPLOYMENT HISTORY
>
> * * * She worked at Hamilton County Job and Family Services between 2000 and 2004, going out in 2004 on disability and being fired in 2005.
>
> * * *
>
> I reviewed Ms. Lowe's job description for Hamilton County Department of Job and Family Services.
>
> * * *
>
> DIAGNOSES
>
> Axis I —        Major Depressive Disorder, Recurrent, Mild (296.31)
>
> Posttraumatic Stress Disorder (309.81)
>
> Axis II —       Deferred
>
> Axis III —      Chiari Malformation, Thalasemia, r/o Fibromyalgia
>
> Axis IV —       Occupational problems
>
> Axis V —    62
>
> * * *
>
> Ms. Lowe is currently working 16 hours per week. She embosses credit cards for 5/3 Bank between 3:00 p.m. and 7:00 p.m. This is described as a low stress position. She said she is able to concentrate and handle this job without any difficulty. She said that it is enjoyable and she works alone. Uneek took this job because she was in need of a greater income as her two disability incomes were considered to be insufficient. The employee told me that Social Security allows her to have a nine-month trial period and if she makes

over $1,000.00 per month, she may lose her benefits (but could regain them if she does not continue employment). She also told me that OPERS was "okay" with this arrangement, as it did not include public service type employment.

* * *

Specifically, I do not feel her recurrent depression is disabling. The employee has had a very good response to Wellbutrin and voluntarily returned to work because of her financial needs. She is performing well at her position (16 hours per week) and there is no reason to assume that this could not move to a full time, 40 hour per week, role. She is not clinically disabled. I see no reason that her previous type of work would be contraindicated.

* * *

She is receiving a combination of psychotherapy plus medication management to contain a depressive disorder. As is the case with recurrent depressions, she has periodic relapses. These are not considered to be work-prohibitive, however. The vast majority of people with depressive disorders are able to work * * *.

{¶ 38} 10. On October 20, 2011, relator was examined by Dr. Middaugh. In her five-page narrative report, Dr. Middaugh states:

**Narrative Medical History:** Ms. Lowe states that she has been on disability through OPERS from her job as a program technician for Hamilton County for the last 5 years. * * *

Ms. Lowe was employed for a total of 4 years and 7 months for Hamilton County and was terminated in 2005. She was responsible for assessing eligibility for Medicaid and food stamps. She states that her job became increasingly busy and stressful. She had to interview clients, review their resources and income and refer paperwork for medical assessments. In addition to regular paperwork and scheduled appointments she was required to see walk-ins and states they were not allowed to wait more than 10 minutes. She felt she couldn't handle her case load and because of underlying ADHD asked her supervisor for accommodations. She states that she was then terminated after revealing that she had ADHD.

* * *

**Medical Record Review:** Medical records provided are quite limited. There is a job description for Hamilton County Department of Job and Family Services for the CPA Specialist Program Technician 2. This is consistent with her job description, conducting applications, processing and gathering necessary information for eligibility regarding Healthy Start, Healthy Families and expedited Medicaid programs.

* * *

**Discussion:** Uneek Lowe is a 55 year old woman with multiple somatic complaints of pain who has suffered for years with depression and also carries a diagnosis of ADHD. She appears to be under appropriate psychiatric treatment. She is reporting multiple somatic complaints and medical problems. She is status post Bell's palsy by history. She has an asymptomatic Chiari-I malformation discovered by MRI scan. This is a congenital condition in which the cerebellar tonsils descend into the upper cervical canal anatomically. She has no physical correlation for these findings. She gives a history of a spinal cord syrinx which is also asymptomatic. Ms. Lowe does have degenerative disc disease in her neck and is status post successful C5-6 anterior cervical fusion and has no neurological deficit and a normal examination. Ms. Lowe also has complaints of fibromyalgia syndrome with a normal examination and no trigger points. She has left shoulder complaints, a history of thalassemia and GI complaints.

From the physical standpoint I see no disabling medical condition.

**Answers to Questions:**

* * *

[Two] Per the OPERS definition of permanent disability, Ms. Lowe is not physically disabled from performing her occupation as a public employee. I see no physical condition that would interfere with any of her job related activities.

[Three] I do not anticipate any significant physical change in her conditions within the next 12 months.

[Four] I do not find any disabling physical diagnoses.

[Five] There is no objective medical evidence from a physical standpoint to support disability.

[Six] Ms. Lowe is receiving routine medical care for her physical complaints.

[Seven] Her subjective complaints and symptoms far outweigh any objective clinical findings and are consistent with her psychiatric diagnosis of depression.

[Eight] Her observed activities and behavior also do not correlate with objective clinical findings noting that she has a normal examination despite her multiple somatic complaints.

{¶ 39} 11. On November 29, 2011, Managed Medical Review Organization ("MMro"), the third-party administrator of OPERS' disability program, issued a report recommending termination of relator's disability benefit. The November 29, 2011 report indicates that the reports of Drs. Miller and Middaugh, as well as earlier medical reports, were reviewed.

{¶ 40} 12. The record contains a one-page OPERS document captioned "Medical Advisor Board Recommendation (F-33)." The document, dated December 5, 2011, indicates that the "medical advisor" is "asmith." The document further states: "Disapprove - Found No Longer Disabled, Terminate Benefit."

{¶ 41} 13. By letter dated December 15, 2011, OPERS informed relator:

The Ohio PERS Retirement Board reviewed your disability benefit file including all medical documentation submitted in connection with your re-evaluation at the December 14, 2011 board meeting.

Based upon all the medical information and recommendations, the Ohio PERS medical consultants and the Board concluded that you are no longer considered to be permanently disabled from the performance of duty as a Program Technician 2. Therefore, your disability benefit will be terminated.

You have a right to appeal the Board's termination of your disability benefit. If you wish to appeal this action, you may

supply additional objective medical evidence, at your expense, to us as the basis of your appeal.

* * *

After you have submitted your additional medical evidence your information will be reviewed by our third party administrator Managed Medical Review Organization (MMro). MMro will evaluate your condition, which may require you to have an in-person medical examination with an independent medical examiner.

{¶ 42} 14. Earlier, on October 4, 2011, relator completed a form provided by OPERS captioned "Employment Review for a Disability Benefit Recipient." (DR-2). The form instructs as follows:

In order for OPERS to make an assessment of your re-employment request, please complete this form in its entirety and as accurately as possible.

Employment after commencement of a disability benefit may impact your eligibility for that benefit. Disability benefit recipients who return to public employment are subject to immediate benefit termination.

{¶ 43} On the form, relator indicated she is employed at Fifth Third Bank at Cincinnati, Ohio, through a temporary services company known as "Adecco." She listed the title of her position as: "Credit Card Production."

{¶ 44} The form asks: "Has your attending physician approved this form of employment." Relator responded to the query by marking the "yes" box. Thereunder, relator wrote in her own hand:

So long as it remains part-time. I work from 3 pm-7 pm. I work with a few employees in a quiet environment that isn't very distracting, or pressure [and] light duty. This works okay with having [ADHD], depression [and] chronic fatigue. I am able to rest during the day before work [and] that gives me enough energy to do this 4 [hour] job 4 days a [week].

{¶ 45} 15. MMro compared relator's previous job at HCDJFS with her new job at Fifth Third Bank. On November 14, 2011, MMro issued a report concluding that relator's

request for approval of her employment at Fifth Third Bank should be denied because of similarities of that job and the HCDJFS job.

{¶ 46} 16. The record contains an OPERS document dated November 17, 2011 and captioned "Medical Advisor Board Recommendation." Therein, the document indicates that "MMro" has advised: "Similarities Found. Recommend Early Annual Review."

{¶ 47} 17. By letter dated November 17, 2011, OPERS informed relator:

> We reviewed the *Employment Review* for a *Disability Benefit Recipient* form (DR-2) that you submitted.
>
> Our third party administrator Managed Medical Review Organization (MMro) performed a vocational assessment of the position(s) you have been and/or are considering undertaking in comparison to your last public employment position. MMro has determined there is similarity between the position(s) you have been and/or considering undertaking and your last public employment position from which you were found to be disabled.
>
> As part of your current annual review, MMro will evaluate your condition which may require you to have an in-person medical examination.
>
> Once the evaluation process is complete, a recommendation as to whether or not you continue to be permanently disabled from the duties of your last public employment position will be made to the Ohio PERS Retirement Board. You will be notified by letter once official action has been taken by the Board on your case.

(Emphasis sic.)

{¶ 48} 18. Relator timely appealed the December 14, 2011 board decision.

{¶ 49} 19. On February 8, 2012, attending physician Zhijun George Guo, M.D., completed an "Attending Physician Statement" on a form provided by OPERS. On the form, Dr. Guo listed the following "disabling condition(s)":

> [One] Chiari I Malformation
> [Two] Chronic Migraine/Fibromyalgia
> [Three] Depression
> [Four] Syringohydre-Myelia

{¶ 50} Dr. Guo marked a "no" box in response to the query:  "Is member expected to return to work with their public employer?"

{¶ 51} 20. On January 6, 2012, at relator's own request, she was evaluated by Leroy Vickers, M.D., who wrote:

> OPERS has recently determined that you are not disabled to perform duty as a Program Technician II, a position previously held by you before you became disabled in 2005.
>
> Your recent medical history includes increasing symptoms including left shoulder pain and weakness, numbness to tongue, off balance, and dizziness. You were hospitalized at Jewish Hosp. Oct. 14, 2011, with neurosurgical/neurological consultation at that time. The work up showed increasing growth of a previously diagnosed Arnold-Chiari malformation/syrinx. This is a congenital lesion. No surgery is advised due to risks involved. Neurologists DR. Rorick and DR. GUO.
>
> This patient has had depression/emotional problems due to above situation and is currently on medication for this. Her psychiatrist is Dr. Khosla (CCHB), Connie Moody is her counselor.
>
> Ms. Lowe has chronic fibromyalgia, ADHD, some memory loss and at this time, Ms. Lowe indicates, and I agree with her that she is permanently disabled but could return to work with Hamilton County with accommodations.

{¶ 52} 21. During September, October, and November 2011, relator underwent a neuropsychological evaluation performed by Robert Krikorian, Ph.D.  Relator was referred to Dr. Krikorian by Dr. Guo.  In his four-page narrative report, Dr. Krikorian opines:

> The neuropsychological studies indicated specific cognitive impairments involving aspects of attention and executive [sic] ability with secondary effects on memory. There also was mild phonological processing inefficiency. While the described deficits are mild, they have functional implications and are consistent with the occupational inefficiency and memory difficulty. In addition, the executive [sic] impairment almost certainly has contributed to her emotional disturbance because the organization and

inhibitory control impairments lead to less effective emotional coping as described above.

{¶ 53} 22.  On January 10, 2012, Dr. Krikorian wrote to relator:

Our evaluation indicated that you have deficits of attention and executive ability, among others, that affect your ability to register information from the environment, integrate complex material, and organize and executive [sic] effective problem-solving strategies. In addition, these deficits will affect memory function in certain contexts by interfering with memory encoding and retrieval processes.

In the context of that evaluation you provided information about problems you have had in certain work environments and you described in particular being overwhelmed and ineffective when working as a technician for Hamilton County Job and Family Services. You cited the volume of work as a major difficulty in that position. Your experiences with that job would be consistent with the findings on our evaluation of attention and executive [sic] impairment. Indeed, our report contained recommendations concerning strategies that might help with organization. Other approaches and accommodations that might be useful generally but especially in such a job would include limiting work load and/or working part-time, increasing training and on-the-job supervision and assistance, frequent monitoring of responsibilities by a supervisor or co-worker in order to insure that [tasks] are completed in a timely way. It would be expected that without such accommodations, you will experience performance difficulties and stress as you did in the past.

{¶ 54} 23. By letter dated April 26, 2012, relator was informed that she was scheduled for a psychiatric evaluation to be performed by Mark Reynolds, M.D.

{¶ 55} 24. On May 11, 2012, relator was evaluated by Dr. Reynolds.  In his ten-page narrative report, Dr. Reynolds states:

**MEDICAL RECORD REVIEW**

Position description for a CPA Specialist with the Hamilton County Department of Job and Family Services.

* * *

**IDENTIFYING INFORMATION**

Uneek Lowe presents as a 56-year-old divorced biracial female employed previously by Hamilton County Job and Family Services, working in eligibility determinations. She indicates having been employed in that position for approximately four years and seven months. She has not worked in that position since 2005. She indicates that she was on medical leave and was terminated while on medical leave.

**PSYCHIATRIC HISTORY**

* * *

The claimant indicates she eventually received disability under OPERS. While on disability and receiving social security benefits, she took a part time job involving feeding credit cards into a machine. She indicates taking this job in order to make extra money due to her basement flooding. She states although this position required much less decision-making and attention skills as opposed to her previous position, it was determined to be similar to her previous position, and as such her OPERS disability was stopped. She indicates having had to stop working in this position in March due to a strain of her rotator cuff. She indicates she has since tried to find other jobs and has had difficulty due to medical concerns.

* * *

**MENTAL STATUS EXAM**

The claimant presented as an alert and oriented, well-developed, well-nourished biracial female in no apparent physical distress. Her speech was of a mildly increased rate, normal rhythm and prosody. Her affect was stable, mildly restricted, appropriate to content and predominantly depressed and irritable mood. Thought form was linear and goal-directed. Thought content was without evidence of hallucination, delusion, ideas of reference, thought broadcasting, thought insertion or current homicidal ideation. She admitted to intermittent suicidal ideation without plan or intent. Her memory for immediate, recent and remote events was good. Her concentration abilities in this setting were unimpaired.

**ASSESSMENT**

Axis I:  296.89      Bipolar Disorder, type II with rapid cycling

         300.0        Anxiety Disorder NOS (including history of Posttraumatic Stress Disorder)

Axis II:  799.9       Deferred

Axis III:             Arnold Chiari malformation, thalassemia, fibromyalgia, rotator cuff tears bilaterally, herniated discs (level unspecified), arthritis and restrictive airway disease

Axis IV:              Multiple medical problems, chronic pain, occupational difficulty

Axis V:               GAF 60 (current)

**FINDINGS AND RECOMMENDATIONS**

* * *

Based upon the definition of disability under OPERS, it would be my opinion that the claimant cannot currently be presumed permanently disabled from a psychiatric standpoint based upon her psychiatric symptomatology alone. It appears that the claimant has a bipolar condition and this has been indicated to her by psychiatrists previously; however, she has resisted trials of mood stabilizing medication. It is likely that with a trial of mood stabilizing medication she could experience a significant decrease in the extent of her psychiatric symptomatology. In addition, even without ideal treatments including mood stabilizing medications, her recent neuropsychological evaluation by Dr. [Krikorian] indicates an ability to return to her previous position of employment. It would be recommended that the claimant not only engage in further psychiatric evaluation and initiation of trial of mood stabilizing medications but that she also institute treatment as recommend[ed] by Dr. [Krikorian] and also recommendations by Dr. [Krikorian] involving her treatment environment [currently] be[ing] entertained.

* * *

> It would be my expectation that flares [sic] in the claimant's fibromyalgia would intensify the extent of her psychiatric symptomatology and vice versa. Based upon the current level of the claimant's psychiatric symptomatology, I do not opine that she is unable to return to work.

{¶ 56} 25. On May 30, 2012, as an employee of MMro, Jeffrey Deitch, D.O., completed a review of medical reports of record. In his two-page report, Dr. Deitch recommended termination of relator's disability benefit. Dr. Deitch did not examine relator, but only reviewed medical records previously noted herein.

{¶ 57} 26. By letter dated June 21, 2012, OPERS informed relator:

> The Ohio PERS Retirement Board reviewed your disability benefit file and recent reports of medical re-evaluation at the June 20, 2012 meeting.
>
> Based upon all the medical information and recommendations, the Ohio PERS medical consultants and the board concluded that you are not considered to be permanently disabled from the performance of duty as a Program Technician 2. As a result, the Board upheld its previous action to terminate your disability benefits. **This decision is final.**

(Emphasis sic.)

{¶ 58} 27. On July 19, 2013, relator, Uneek V. Lowe, filed this mandamus action.

Conclusions of Law:

{¶ 59} Three main issues are presented: (1) whether the board abused its discretion in failing to determine whether the alleged disabling medical conditions prevent relator from performing her recent position at Fifth Third Bank, (2) whether any of the medical reports must be eliminated from evidentiary consideration because the examining physicians allegedly failed to show sufficient knowledge of relator's job duties at HCDJFS, and (3) whether there is some evidence in the record supporting the board's presumed determination that, based upon pertinent R.C. 145.362 examinations reported by board-appointed examining physicians, relator is no longer physically and

psychologically unable to perform her former position at HCDJFS upon which her disability benefit was premised.

{¶ 60} The magistrate finds: (1) the board was not required to determine whether the alleged disabling medical conditions prevent relator from performing her recent position at Fifth Third Bank, (2) none of the medical reports need be eliminated from evidentiary consideration due to an alleged failure of the examining physician to show sufficient knowledge of relator's job duties at HCDJFS, and (3) there is some evidence in the record supporting the board's presumed determination based upon pertinent R.C. 145.362 examinations, that relator is no longer physically and psychologically unable to perform her former position at HCDJFS upon which her disability benefit was premised.

{¶ 61} Accordingly, as more fully explained below, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.

{¶ 62} Preliminarily, it can be observed that, with its December 14, 2011 initial decision and its June 20, 2012 final decision terminating relator's disability benefit, the board chose not to specifically cite to the medical evidence supporting its decisions.

{¶ 63} That is, in its December 15, 2011 letter, OPERS simply informed relator:

> Based upon all the medical information and recommendations, the Ohio PERS medical consultants and the Board concluded that you are no longer considered to be permanently disabled from the performance of duty as a Program Technician 2. Therefore, your disability benefit will be terminated.

{¶ 64} Immediately prior to its December 14, 2011 initial decision, at the request of OPERS, relator underwent a psychiatric evaluation performed by Dr. Miller on October 17, 2011. Also at the request of OPERS, relator underwent a physical examination performed by Dr. Middaugh on October 20, 2011.

{¶ 65} As earlier noted, Dr. Miller opined: "She is not clinically disabled. I see no reason that her previous type of work would be contraindicated." Also, Dr. Miller opined that relator's "recurrent depressions * * * are not considered to be work-prohibitive."

{¶ 66} As earlier noted, Dr. Middaugh opined:

> Per the OPERS definition of permanent disability, Ms. Lowe is not physically disabled from performing her occupation as

a public employee. I see no physical condition that would interfere with any of her job related activities.

{¶ 67} Presumably, in its December 14, 2011 initial determination to terminate the disability benefit, the board relied upon the reports of Drs. Miller and Middaugh.

{¶ 68} Immediately prior to its June 21, 2012 final decision, at the request of OPERS, relator underwent a psychiatric examination performed by Dr. Reynolds on May 11, 2012. In his report, Dr. Reynolds opined:

Based upon the definition of disability under OPERS, it would be my opinion that the claimant cannot currently be presumed permanently disabled from a psychiatric standpoint based upon her psychiatric symptomatology alone.

{¶ 69} Relator did not undergo another physical examination at the request of OPERS following the board's initial decision to terminate disability benefits. That is, following the board's December 14, 2011 initial decision, OPERS only had relator examined by a psychiatrist. It is not clear why OPERS did not have relator physically examined following relator's administrative appeal of the board's December 14, 2011 initial decision.

## Basic Law

{¶ 70} Effective September 16, 1998, R.C. 145.362 stated:

The public employees retirement board shall require any disability benefit recipient to undergo an annual medical examination, except that the board may waive the medical examination if the board's physician or physicians certify that the recipient's disability is ongoing.

On completion of the examination by an examining physician or physicians selected by the board, the physician or physicians shall report and certify to the board whether the disability benefit recipient is no longer physically and mentally incapable of resuming the service from which the recipient was found disabled. If the board concurs in the report that the disability benefit recipient is no longer incapable, the payment of the disability benefit shall be terminated * * *.

* * *

Each disability benefit recipient shall file with the board an annual statement of earnings, current medical information on the recipient's condition, and any other information required in rules adopted by the board. The board may waive the requirement that a disability benefit recipient file an annual statement of earnings or current medical information if the board's physician certifies that the recipient's disability is ongoing.

{¶ 71} Effective January 7, 2013, R.C. 145.362 states:

The public employees retirement board shall require any disability benefit recipient to undergo an annual medical examination, except that the board may waive the medical examination if the board's physician or physicians certify that the recipient's disability is ongoing or for any other reason specified in rules adopted by the board.

* * *

On completion of the examination by an examining physician or physicians selected by the board, the physician or physicians shall report and certify to the board whether the disability benefit recipient meets the applicable standard for termination of a disability benefit.

(A) Regardless of when the disability occurred, if the recipient's application for a disability benefit was received by the system before the effective date of this amendment, * * * the standard for termination is that the recipient is no longer physically and mentally incapable of resuming the service from which the recipient was found disabled.

* * *

(B)(3) * * * If the board concurs in the report that the disability benefit recipient meets the applicable standard for termination of a disability benefit, the payment of the disability benefit shall be terminated.

Each disability benefit recipient shall file with the board an annual statement of earnings, current medical information on the recipient's condition, and any other information required in rules adopted by the board. The board may waive the requirement that a disability benefit recipient file an

annual statement of earnings or current medical information if the board's physician certifies that the recipient's disability is ongoing.

{¶ 72} Former Ohio Adm.Code 145-2-21 stated:

(A) For the purpose of sections 145.35, 145.36, 145.361, and 145.37 of the Revised Code and PERS rules:

(1) "Disability" means presumed permanent mental or physical incapacity for the performance of a member's present duty or similar service that is the result of a disabling condition that has occurred or has increased since an individual became a member.

* * *

(6) "Examining physician" means a physician appointed by the PERS board.

(B) A member shall make application for a disability benefit on a form provided by the retirement system.

(1) Consideration of a member's application shall be limited to the disabling condition(s) listed in the application or disclosed by the examination of the physician(s) selected by the retirement system and the report of attending physician(s) on a form provided by the retirement system.

(2) Upon receipt of a completed application, report of employer, report of attending physician(s), report of examining physician(s) and, if available, reports of employment physical examinations, the retirement system's medical consultant(s) shall review all such documentation and prepare a recommendation to the public employees retirement board.

* * *

(C) The board at its regular meetings shall review disability applications and the written recommendations of its medical examiners and medical consultant. The determination by the board on any application is final.

* * *

(D) The retirement board may require a member to submit to a subsequent medical examination by a physician selected by the retirement board provided the medical consultant recommends such examination in order to evaluate continued eligibility for disability benefits.

{¶ 73} Currently, Ohio Adm.Code 145-2-21, effective September 16, 2013, states:

(A) For the purpose of sections 145.35, 145.36, 145.361, 145.362, and 145.37 of the Revised Code and agency 145 of the Administrative Code:

(1) "Disability" means the following:

(a) At the time of application, a presumed permanent mental or physical incapacity for the performance of a member's present or most recent public duty that is the result of a disabling condition that has occurred or has increased since an individual became a member.

(b) At the time of medical examination pursuant to section 145.362 of the Revised Code:

(i) For a disability benefit recipient whose application for disability benefits was received before January 7, 2013, and for a disability benefit recipient whose application was received on or after January 7, 2013, * * * a disabling condition that renders the member mentally or physically incapable of resuming the service from which the member was found disabled.

{¶ 74} " '[M]andamus is an appropriate remedy where no statutory right of appeal is available to correct an abuse of discretion by an administrative body.' " *State ex rel. Cydrus v. Ohio Public Emps. Retirements Sys.*, 127 Ohio St.3d 257, 2010-Ohio-5770, ¶ 12, quoting *State ex rel. Pipoly v. State Teachers Retirement Sys.,* 95 Ohio St.3d 327, 2002-Ohio-2219, ¶ 14.

{¶ 75} "The determination of whether a retirement-system member is entitled to the continued receipt of disability-retirement benefits is within the exclusive authority of the retirement board, R.C. 145.362, and the board's denial of an appeal from the termination of these benefits is final and not subject to appeal." *Cydrus* at ¶ 12. "Because

there is no right to appeal the retirement board's decision terminating disability-retirement benefits, mandamus is an appropriate remedy." *Id.* at ¶ 13.

{¶ 76} A clear legal right to a writ of mandamus exists when an agency is found to have abused its discretion by entering a decision that is not supported by some evidence. *State ex rel. Schaengold v. Pub. Emp. Retirement Sys.*, 114 Ohio St.3d 147, 2007-Ohio-3760, ¶ 19; *State ex rel. Marchiano v. School Emps. Retirement Sys.*, 121 Ohio St.3d 139, 2009-Ohio-307, ¶ 20-21; *Kinsey v. Bd. of Trustees of Police & Firemen's Disability & Pension Fund of Ohio*, 49 Ohio St.3d 224, 225 (1990).

{¶ 77} It is perhaps worth noting that, in *Cydrus*, the Supreme Court of Ohio held that the retirement board did not abuse its discretion by relying on Dr. Steiman's medical report in terminating the disability benefit. The Supreme Court found that Dr. Steiman's report "constituted sufficient evidence to support the board's determination." *Id.* at ¶ 31. The Supreme Court did not use the term "some evidence" in upholding the evidentiary value of Dr. Steiman's report.

{¶ 78} Because there is no statutory provision that it do so, OPERS is not required to provide an explanation for its decision or cite to the evidence that supports its decision. *Id.* The lack of such statutory provision does not violate Ohio's separation-of-powers doctrine. *Id.* at ¶ 22-24. Also, the benefit recipient is not denied procedural due process when OPERS fails to identify the evidence it relied upon and to briefly explain its reasons for terminating the disability benefit. *Id.* at ¶ 25-27.

### First Issue

{¶ 79} Regarding the first issue, former R.C. 145.362 provides that the board shall determine "whether the disability benefit recipient is no longer physically and mentally incapable of resuming the service from which the recipient was found disabled." R.C. 145.362 currently provides that "the standard for termination is that the recipient is no longer physically and mentally incapable of resuming the service from which the recipient was found disabled."

{¶ 80} Former Ohio Adm.Code 145-2-21(A)(1) defines "disability" as the "presumed permanent mental or physical incapacity for the performance of a member's present duty or similar service that is the result of a disabling condition * * *."

{¶ 81} Currently, Ohio Adm.Code 145-2-21, effective September 16, 2013, provides that "disability" means "a presumed permanent mental or physical incapacity for the performance of a member's present or most recent public duty that is the result of a disabling condition * * *."

{¶ 82} As earlier noted, on October 4, 2011, relator completed an OPERS form on which she reported her employment at Fifth Third Bank through Adecco performing credit card production. On the form, relator reported that she worked there part-time including four hours per day. She indicated no medical difficulty performing the job. Thereafter, MMro found similarities between the job at Fifth Third Bank and the job at HCDJFS, and recommended action by OPERS.

{¶ 83} Based on the forgoing scenario, relator argues:

> Why didn't OPERS consider Lowe's last "similar" job when it had her evaluated by its physicians? Here again, Ohio Adm.Code 145-2-21 (A) defines disability for PERs [sic] purpose. It explicitly states that the focus is on "the member's present duty or similar service." Therefore basic fairness says that consideration should have been given to Lowe's last position. Therefore, OPERS and its Third Party Management Company abused its discretion by not demonstrating the essential job duties of the Credit Card Production position. See Adm.Code 145-2-21(A).

(Relator's brief, 33-34.)

{¶ 84} The magistrate disagrees with relator's argument.

{¶ 85} To begin, relator invokes former Ohio Adm.Code 145-2-21(A)(1)'s reference to "a member's present duty or similar service" and particularly notes the phrase "similar service." However, relator ignores the provision of R.C. 145.362 indicating that the relevant inquiry is whether relator is "incapable of resuming the service from which the recipient was found disabled."

{¶ 86} Relator does not contend that her Fifth Third Bank job involves "the service from which [she] was found disabled." Relator does not contend that her job at HCDJFS is not the job from which she was found disabled. Relator cannot simply ignore the statutory language, and then give the code provision her own interpretation that is inconsistent with the statute.

{¶ 87} Moreover, to the extent that former Ohio Adm.Code 145-2-21(A)(1)'s definition of "disability" lacked clarity in this regard, current Ohio Adm.Code 145-2-21(A)(1) makes clear that it is the member's *public* duty that is at issue in the determination. Undisputedly, the job at Fifth Third Bank did not involve relator's public duty. In short, relator's first argument lacks merit.

### Second Issue

{¶ 88} As earlier noted, the second issue is whether any of the medical reports must be eliminated from evidentiary consideration because the examining physicians allegedly failed to show sufficient knowledge of relator's job duties at HCDJFS.

{¶ 89} The magistrate finds *State ex rel. Clark v. Indus. Comm.*, 72 Ohio St.3d 377 (1995), a case involving workers' compensation, to be helpful, if not instructive, on the issue here.

{¶ 90} In *Clark*, at 379, the court applied a legal principle from *State ex rel. Braswell v. Indus. Comm.*, 25 Ohio St.3d 61, 63 (1986):

> [A] physician conducting a medical examination, where the claimant seeks temporary total disability benefits, should, in most cases, possess some knowledge of the physical requirements associated with the former position of employment[.][W]e deem it unnecessary for the physician to trace, in detail, every physical movement necessitated during the average workday.

{¶ 91} The issue in *Clark* was whether Dr. Dobrowski's report satisfied *Braswell*. In his report, Dr. Dobrowski opined that the claimant "could return to his previous position as a construction worker." *Id.* at 378. He also noted that the claimant was injured "pushing an air compressor." *Id.* Concluding that Dr. Dobrowski's report satisfied *Braswell*, the *Clark* court states, at 380:

> Claimant responds that "construction worker" is too general a term, claiming that it encompasses many different duties entailing many different levels of physical exertion. While this may be true, there is no evidence that Dr. Dobrowski misperceived claimant's duties to the detriment of any interested party. There is no indication that Dr. Dobrowski based his conclusion on the erroneous belief that claimant's occupation consisted of sedentary, light or medium work. To the contrary, Dr. Dobrowski noted that claimant was injured

while pushing an air compressor-a heavy piece of machinery. Accordingly, we find that the report was "some evidence" supporting the commission's decision.

{¶ 92} In *State ex rel. Kelly v. State Teachers Retirement Sys.*, 10th Dist. No. 11AP-527, 2012-Ohio-4613, this court, adopting the decision of its magistrate, held that the medical reports of Elizabeth Mease, M.D. and Christopher Mabee, M.D., support the decision of the retirement system to terminate the disability benefit. This court explained: "While each report could have provided more detail about relator's job duties, neither report indicates a misunderstanding of the physical requirements of the position." *Id.* at ¶ 10.

{¶ 93} As earlier noted, presumably, the board relied upon the reports of Drs. Miller and Middaugh when it initially determined to terminate the disability benefit.

{¶ 94} As earlier noted, in his eight-page narrative report of his October 17, 2011 psychiatric examination, Dr. Miller states:

> I reviewed Ms. Lowe's job description from Hamilton County Department of Job and Family Services.

{¶ 95} Other than stating that he reviewed the HCDJFS job description, Dr. Miller does not specify any of the job duties of this position.

{¶ 96} However, when Dr. Miller opines: "I see no reason that her previous type of work would be contraindicated," it can be inferred that Dr. Miller was aware of the duties of the HCDJFS job. That inference can be drawn by the board that weighs the evidence before it.

{¶ 97} As earlier noted, in her five-page narrative report, Dr. Middaugh wrote:

> **Medical Record Review:** Medical records provided are quite limited. There is a job description for Hamilton County Department of Job and Family Services for the CPA Specialist Program Technician 2. This is consistent with her job description, conducting applications, processing and gathering necessary information for eligibility regarding Healthy Start, Healthy Families and expedited Medicaid programs.

{¶ 98} It is difficult to see how the above-quoted portion of the report can be viewed as anything but a showing of sufficient knowledge of the HCDJFS job tasks.

Dr. Middaugh not only acknowledges that she reviewed the job description, she also compared the job description with the job description relator reported to her at the examination.

{¶ 99} As earlier noted, on appeal of the board's initial decision, relator underwent another psychiatric examination performed by Dr. Reynolds on May 11, 2012. In his ten-page report, Dr. Reynolds stated that he reviewed the "[p]osition description for a CPA Specialist with the Hamilton County Department of Job and Family Services." Other than stating that he reviewed the HCDJFS job description, Dr. Reynolds does not specify any of the job duties of this position.

{¶ 100}    In his report, Dr. Reynolds does not opine that relator is medically able to return to her former position at HCDJFS. Rather, Dr. Reynolds opines that relator's psychiatric symptomatology is not permanent because relator has not been treated with "mood stabilizing medication." This is significant because knowledge of the duties of the former position at HCDJFS would not be critical to Dr. Reynolds' conclusion that "mood stabilizing medication" should be tried before any assessment of relator's ability to return to the HCDJFS job.

{¶ 101}    Accordingly, relator's challenge to the board's reliance upon the reports of Drs. Miller, Middaugh, and Reynolds is unpersuasive.

### Third Issue

{¶ 102}    The third issue is whether the board's determination that relator is no longer physically and psychologically unable to perform her former position at HCDJFS is supported by some evidence in the record, and particularly by the board-appointed examining physicians of record. Only Drs. Miller, Middaugh, and Reynolds were R.C. 145.362 examining physicians selected by the board to examine relator with respect to the benefit termination at issue here. Relator underwent two psychiatric examinations, one before, the other after the board's initial decision of December 14, 2011. Relator only underwent one physical examination which was performed by Dr. Middaugh before the initial decision. No physical examination was performed by a board selected physician after the initial decision. Thus, in rendering its final decision, the board must have relied exclusively upon the report of Dr. Middaugh for the physical component of the disability claim.

{¶ 103}      Relator has not claimed error in the failure of OPERS to schedule another physical examination by a board-selected physician, and the magistrate does not find error under the circumstances here.  Accordingly, Dr. Middaugh's report is also some evidence upon which the board presumably relied to support the determination to discontinue disability benefits.

{¶ 104}      Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.

/S/ MAGISTRATE
KENNETH W. MACKE

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).